811 A.2d 359

**John R. DANAHER**

v.

**DEPARTMENT OF LABOR, LICENSING & REGULATION.**

**No. 02142, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Nov. 27, 2002.

John F. Conwell (Davis & Associates Law Offices, P.A., on the brief) Towson, for appellant.

Jean Harvey Baker, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief) Baltimore, for appellee.

Argued before HOLLANDER, KRAUSER and PAUL E. ALPERT (Retired, Specially Assigned), JJ.

HOLLANDER, J.

This appeal is rooted in the discharge of John Richard Danaher, appellant, who was terminated from employment in 1998 by the Maryland Department of Labor, Licensing and Regulation ("DLLR," the "Department," or the "Employer"), appellee, after approximately twenty-five years of State service. Following complaints by three DLLR employees, appellant was fired because of "unjustifiably offensive conduct toward fellow employees."

The Employer discharged appellant, with prejudice, about one hour after advising him of the allegations of misconduct. Based on procedures applicable to an at-will, "management service" employee in the Executive Branch of State government, appellant was not afforded a hearing with the Office of Administrative Hearings ("OAH"). Thereafter, Eugene Conti, Jr., the Secretary of DLLR, denied Danaher's appeal, on the ground that Danaher failed to identify an illegal or unconstitutional ground with respect to the termination, as required by 17.04.05.01 of the Code of Maryland Regulations ("COMAR").

Appellant subsequently sought review of DLLR's action in the Circuit Court for Baltimore County. By order dated November 13, 2000, the circuit court affirmed. From that order, appellant noted this appeal, and presents the following questions for our review:

I. Did the Department fail to reclassify appellant as either a skilled or professional service employee after restructuring his job position, thus denying him appropriate administrative review of his termination?

II. Did DLLR violate appellant's rights by ignoring the legal strictures of Title Eleven of the State Personnel and Pensions Article, requiring the appointing author-

ity to investigate, consider mitigation, and meet with the employee within thirty days prior to termination?

III. Did DLLR arbitrarily and capriciously classify this termination as one "with prejudice", which is reserved for only those proven actions that are so egregious as to not merit employment in any capacity with the State?

For the reasons that follow, we shall vacate the judgment and remand for further proceedings.

### FACTUAL SUMMARY[1]

As noted, Danaher was an employee of the State for twenty-five years. At one time, he served as the Director of Finance of DLLR, a position within the management service of the State Personnel Management System. According to appellant, his duties changed considerably on January 6, 1998, when he was reassigned to the Accounting Unit as a Fiscal Administrator V.[2] As a result of that reassignment, Danaher claims he no longer had direct responsibility for the oversight and management of personnel or financial resources. Nevertheless, it is clear that, at the time of his discharge, appellant was a management service employee.

The Record Extract shows that Danaher and others attended "Sexual Harassment Training" on March 19, 1996, for a total of three hours. Moreover, DLLR has a written, one-page "Sexual Harassment Policy," which became effective on July 1, 1997. It states that the Department is "committed to

---

1. As we indicated, there was no administrative hearing. As a result, no evidence was presented at the agency level. Moreover, the record does not include appellant's personnel file or other information as to his date of hire, job responsibilities, or performance evaluations. Therefore, we have relied on the facts as presented by the parties, most of which are not disputed.

2. Donald Crumble, Director of the Office of Personnel and Training for DLLR, said in an affidavit of April 15, 2000, submitted to the circuit court, that appellant held this position since January 1997, not January 1998. The date discrepancy is not significant, however.

creating a workplace void of all unlawful discrimination and ... free from harassment or intimidation based upon sex." The policy lists examples of unacceptable conduct, including suggestive remarks, gestures, or jokes of a sexual nature, and intentional physical behavior. Further, the policy provides that "[s]wift and appropriate disciplinary actions up to and including termination will be taken against any DLLR employee found to have sexually harassed any other DLLR employee."

By memorandum of May 15, 1998, Denise Carroll, an employee in DLLR's Employee Relations Unit, wrote to Donald Crumble, DLLR's Director of the Office of Personnel and Training, regarding a "Lewd Statement by Rick Danaher." According to Ms. Carroll's memorandum, Sheena Thomas and Andrea, whose last name was not known to Ms. Carroll, were "within the hearing distance ..." [3] when appellant made his offensive remarks on May 15, 1998. Ms. Carroll stated, in part:

On the afternoon of Friday, May 15, 1998, .... I went to the fourth floor snack room to make a purchase.... Richard Danaher, started a conversation with me and made a *colorful* statement. The conversation started out discussing voting preferences and continued like this:

As I was paying for my purchase at the coffee mug next to Andrea's cubicle, Mr. Danaher asked, "Who are you?"

I said to him, "Rick, I was in your office for a meeting not too long ago, you don't remember who I am? If you don't remember my name, you should remember my face."

Rick said to me, "I am not good with faces; I'm better with *butts.*"

I put up my hand up as if to say *stop* and said, "Hold it right there. Don't even go there." I then told Rick my name and that I worked in Personnel.

Rick asked me, "Where do you work in Personnel?"

I said to him, "I work with Sharon Ball."

---

**3.** We are advised that Andrea's full name is Andrea Yeates.

> Rick put his hand to his head and said, "Oh no! I stay in trouble. Another one of those social service people."

(Italics and underline in original). Ms. Carroll added that the conversation occurred within "hearing distance" of Sheena Thomas and an individual named Andrea, whose last name she did not know. But, Ms. Carroll was not "sure" if they heard what had been said.

In addition, Meriel Newsome, another DLLR employee, sent an undated memo to Sharon Ball, the "Deputy Director/Employer Relations Manager," regarding "Inappropriate Statements Made by Rick Danaher" on May 15, 1998. She indicated that an employee named Sheena was also present. Ms. Newsome stated, in part:

> On Friday, May 15, 1998, ... Sheena [Thomas] ... introduced me to Mr. Rick Danaher. . . .
>
> ... I mentioned [in my conversation with Danaher] that in Canada the sales tax is really high ... however the health care system is totally free. He made the statement "You must be a democrat, you have to be because you are black[.]". . . I then stated that I always had very good health care because my parents have good jobs and that I felt that everyone is entitled to good healthcare [sic].
>
> Then Rick made a joke about my having Polish ancestry which I didn't understand. He explained to me that there was a stereotype about Polish people being hypochondriacs. Rick asked me if I had ever seen a certain television show and I told him "No." He said to me "You need to stop watching so much B.E.T. (Black Entertainment Television)." I told him that I don't watch very much television at all. . . .
>
> Sheena then mentioned, to Rick, that I was elected "Miss Coppin" and showed Rick the Ebony Magazine so that he could see my picture. He stated that "I can't tell which one you are because you all look alike." Rick then asked me if I had any naked pictures of myself and I told him no. He then made a joke, saying "Do you want to buy some?"
>
> Rick also, in my presence, told Sheena that she needs to get married because she is ruining her life since she had two

children and wasn't married. She told Rick that she her [sic] life was not ruined. Rick said "Not necessarily because you are not young but the Bible says that people should marry if they are going to have children." Rick then said most of those girls having babies are very young. I felt that this comment was racially motivated.

I got the feeling that Rick wanted me to respond in some way because he made all of these inappropriate statements twice to make sure that I heard him clearly. I didn't take any of these statements personally because I don't know Rick very well. However, I don't feel the comments he made were in good taste. I felt that his racially stereotypical comments could make someone very angry. I also felt that the question he asked me about ... owning naked pictures was belittling and sexist.

In an undated memorandum, Melissa Ellen, Personnel Clerk, reported to Crumble that she witnessed appellant engage in inappropriate touching of Trudy Meads, Danaher's Administrative Assistant.[4] At the time, Ms. Meads was pregnant. Ms. Ellen wrote, in part:

They [i.e., Trudy Meads and appellant] were about to leave [my cubicle] when Mr. Danaher got behind Trudy (who is about 6 months pregnant) and put his hand underneath her blouse, and I really did not pay any attention to this action until I heard this popping noise which I realized was the elastic of her pants. This was in the middle of the aisle in my office because I have an open cubicle and there was also another person in the office at the time. This was a very open scene.

On May 18, 1998, Crumble sent a memorandum to Thomas Crowley, Chief Financial Officer.[5] Crumble said:

---

**4.** Based on the text of Ms. Ellen's memorandum, it appears that it was written in late April 1998.

**5.** The memorandum dated May 18, 1998, from Crumble to Crowley refers to complaints by **Lisa** Allen and Denise Carroll. We assume that Crumble's reference to **Lisa** Allen was a mistake, and that he actually meant **Melissa** Ellen.

In less than one month, Mr. Danaher has managed to offend another female member of my staff. Ms. Denise Carroll of my Employee Relations Unit was wantonly offended when Mr. Danaher made a verbal statement to her indicating that he "was not good at remembering faces, but good at remembering BUTTS!" Mr. Danaher also makes reference that my Deputy Director is a "Social Worker" and that shows a lack of respect.

I feel that we can no longer tolerate this kind of attitude from a senior staff member who evidently has no regard for the feelings of female employees in this Department. I recommend that Mr. Danaher be terminated immediately under the circumstances of the attached memorandum from Ms. Denise Carroll dated May 15, 1998 and the written testimony from Ms. Lisa Allen [sic] dated April 28, 1998.

At about 3:00 p.m. on May 19, 1998, Danaher was orally advised about the allegations of inappropriate workplace behavior that had been lodged against him. By 4:00 p.m. on that date, in a letter from the Secretary of DLLR, appellant was terminated, with prejudice, effective June 3, 1998. Citing § 11–104(7)(ii) of the State Personnel and Pensions Article ("S.P.P.") of the Maryland Code (1993, 1997 Repl.Vol.), the Secretary stated that the discharge was "due to [appellant's] unjustifiably offensive conduct toward fellow employees." Appellant was also advised of his right to appeal under S.P.P. § 11–113. In addition, appellant was provided with an "Unsatisfactory Report of Service," notifying him that his termination was "with prejudice." [6]

On May 20, 1998, Danaher appealed the termination to the Secretary of DLLR. He also completed a "State Personnel Management System Appeal and Grievance Form" in regard to his appeal, in which he asserted that his termination was

---

6. S.P.P. § 11–104 is titled "Disciplinary actions permitted." S.P.P. § 11–104(7)(ii) provides for the termination of an employee, with prejudice, if the employee's actions "are egregious to the extent that the employee does not merit employment in any capacity with the State...."

"arbitrary, capricious, and has no factual basis." Appellant added: "Additional issues of fact and law may and will be developed during the course of discovery and hearing on employee's appeal."

By letter of June 10, 1998, the Secretary upheld the termination. The Secretary stated, in pertinent part:

I have received and reviewed the appeal of your recent termination. Please be advised that your appeal was considered pursuant to State Personnel and Pensions Article, Sections 11–113 and 11–305, which states, in part:

"An appeal ... may only be based on the grounds that the disciplinary action is illegal or unconstitutional."

The appeal submitted on your behalf did not specify a legal nor constitutional basis on which it could have been considered, as required by COMAR 17.04.05.01[F]. Based upon my review of this matter, I have decided to uphold the disciplinary termination.

Pursuant to Title 11–113(b)(3), this decision is the *final* administrative decision.

The Record Extract contains a transcript of a recorded statement provided by Trudy Meads on June 10, 1998, which is the same date on which the Secretary upheld appellant's termination. Ms. Meads, who was appellant's assistant, stated that she had known appellant since March 1989. She characterized their relationship as "professional" and "enjoyable." Moreover, Ms. Meads insisted that appellant had never made any offensive racial or sexual remarks to her, nor had anyone ever complained to her about such conduct. Significantly, she characterized as "false" the allegations in which Danaher was accused of putting his hand under her clothes. When asked whether there was any truth to the allegations, Ms. Meads responded: "None whatsoever." Nor was she aware of any such conduct involving Danaher and someone else. Rather, Ms. Meads attributed the incident to "playful banter" that is accepted in the workplace, and which continued after Danaher had been fired.

Ms. Meads also recounted that she had filed a grievance to dispute the allegations that Danaher touched her. Although she had approached Crumble about the matter, she recalled that Crumble declined to discuss it, saying it was "confidential." Ms. Meads added that Danaher is "one in a million," and completely "fair, no matter who you are. . . ." Moreover, she maintained that she had never known him to discriminate based on race or gender.

On July 9, 1998, appellant sought review of the agency's decision in the circuit court. In September 1998, appellant filed a "MOTION TO ORDER THE [DLLR] TO CONSIDER ADDITIONAL EVIDENCE AND TO STAY THE TIME FOR FILING A RULE 7–207 MEMORANDUM OF LAW." That motion was denied on January 21, 1999.

While the matter was pending in circuit court, Crumble submitted an affidavit of April 5, 2000, amplifying, for the first time, some of the facts and circumstances that culminated in the termination of appellant. He averred, in part:

2. Richard Danaher remained in the same position, at the same rate of pay, and classification of Fiscal Administrator V from January 1997 until his termination in June of 1998. Mr. Danaher was assigned to the management service within the State Personnel Management System pursuant to personnel reform legislation.

3. I conducted the Department's investigation of the incidents giving rise to Mr. Danaher's termination. Ms. Melissa Ellen reported first to my deputy, and then to me, informed [sic] that she witnessed Mr. Danaher placing his hands under the shirt of Mr. Danaher's assistant, Ms. Meads, to pull the elastic of her pants. Ms. Ellen was upset when she reported these events. I asked Ms. Ellen to place her statement in writing. *I did not feel it was necessary to speak with Ms. Meads, the employee who was involved in the touching incident, because I was aware of the close working relationship between Ms. Meads and Mr. Danaher, and was concerned about Ms. Mead's [sic] veracity.*

4. Only two weeks later, another DLLR employee, Ms. Denise Carroll reported first to my deputy, and then to me, that she had a conversation with Mr. Danaher in which Mr. Danaher commented that he did not recognize Ms. Carroll's face but was "better with butts." Ms. Carroll was upset when she reported these events to my deputy. I asked Ms. Carroll to put her statement in writing.

5. *I found both Ms. Carroll's and Ms. Ellen's statements to be credible. I took into consideration the fact that these employees were willing to put their statements in writing.*

6. After considering the Ellen and Carroll incidents, I wrote to Mr. Danaher's supervisor Thomas Crowley, Director of Budget and Fiscal, suggesting that disciplinary action be taken against Mr. Danaher based upon his workplace conduct. While the Department was evaluating the situation, the third statement by Ms. Meriel Newsome was brought to the Department's attention. On the very same day that Mr. Danaher made inappropriate comments to Ms. Carroll, he also made both sexually and racially inappropriate comments to Ms. Newsome, a DLLR intern, concerning her race and naked pictures. I felt that there was a pattern of conduct which made the statements even more credible.

7. Pursuant to a delegation from the Secretary of the Department, Mr. Thomas Crowley, Mr. Danaher's supervisor, and I met with Mr. Danaher. We informed him of the allegations, and provided him with the opportunity to respond.

8. After meeting with Mr. Danaher, we reported to the Secretary the events from the meeting. *Taking into consideration* the credibility of the employees making the allegations against Mr. Danaher, the pattern of conduct reflected in the three statements, Mr. Danaher's response, the existence of *any mitigating circumstances,* and the law on discrimination and harassment, the Secretary made the final decision to terminate Mr. Danaher.

(Emphasis added).

On October 19, 2000, the circuit court held a hearing on the matter. In her oral ruling, the judge said:

This case comes before the Court today as an appeal from a decision of the Secretary of the Department of Labor, Licensing and Regulation to terminate the State service of the petitioner, John R. Danaher. There are a number of issues which Mr. Danaher raises in the appeal. [He] has the burden of proof here, and he must prove that the Secretary's determination and decision was either illegal or based on an an, an [sic] unconstitutional ground.

It is apparent to me that when Mr. Danaher had his job duties moved from one place to another that he continued to be an at-will employee of the State of Maryland. He did not seek reclassification during the time he was employed with the State and it's too late to complain about it now.

... Section 11–106 of the State Personnel and Pensions Article provides that prior to taking disciplinary action for employee misconduct—the Agency will investigate the alleged misconduct, which it did, meet with the employee, which is, it apparently did, based upon an affidavit, I think it's from Sharon Ball, consider mitigating circumstances, determine the appropriate disciplinary action and give written notice of the action below of Frederick A. Blow. I am persuaded that the Agency did all that it had to do under 11–106. This was not an automatic termination. It, *the conduct that was set out against Mr. Danaher did not fall specifically within one of the automatic termination criteria;* it was done in conformity with the law.

The other matter is the termination with prejudice. And I can certainly understand why Mr. Danaher is extremely upset and angry that he would be determined, to be let go with prejudice after 25 years of credible service to the State of Maryland, but the Secretary has discretion to terminate an employee with prejudice and it is not up to the Court to, to substitute its judgment for that, the Secretary in making that determination. The appeal petition is denied and I will sign an order.

By Order dated November 13, 2000, the circuit court dismissed appellant's petition for judicial review, finding that the "Department's decision to deny [appellant's] appeal of his

termination for lack of illegal or unconstitutional grounds is supported by the record."

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Our analysis begins with a review of the statutory scheme involved in this case. Following a study undertaken by a Task Force appointed by the Governor, the so called State Merit System was revised by the State Personnel Management System Reform Act of 1996 (the "Act"). *See Dep't of Pub. Safety and Corr. Servs. v. Beard,* 142 Md.App. 283, 298, 790 A.2d 57, *cert. denied,* 369 Md. 180, 798 A.2d 552 (2002); *Western Corr. Inst. v. Geiger,* 130 Md.App. 562, 567–68, 747 A.2d 697 (2000), *aff'd in part, rev'd in part on other grounds,* 371 Md. 125, 807 A.2d 32 (2002); *see also State Election Bd. v. Billhimer,* 314 Md. 46, 548 A.2d 819 (1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989). The General Assembly created the State Personnel Management System ("SPMS") to govern the employment of persons in the Executive branch of State government. *See* S.P.P. § 6–202 *et seq.* SPMS falls "under the authority of the Secretary of Budget and Management." S.P.P. § 6–101.

Pursuant to S.P.P. § 6–102, the "basic purpose" of the SPMS "is to provide a system of employment for employees under the authority of the Secretary." To that end, the SPMS "establishes categories of service for employees based on the general nature of the employee's duties or method of appointment." S.P.P. § 6–102(1)(i). In particular, it "groups employees into classes based on specific duties ...," S.P.P. § 6–102(2)(i), and "provides for a system of merit employment in the skilled service and professional service," based on a "standard" of "business efficiency." S.P.P. § 6–102(3). Further, SPMS "provides procedures for the appointment, discipline, and termination of employees in each service." S.P.P. § 6–102(1)(ii). Additionally, it provides "a process for the ... prompt removal of employees." S.P.P. § 6–102(4)(ii).

Specifically, within SPMS, there are six employment categories: skilled service; professional service; management service; executive service; special appointees; and temporary employees. *See* S.P.P. §§ 6–401 to 6–406. Under S.P.P. § 6–401(a), "all positions in the Executive Branch of State government that are included in the State Personnel Management System are in the skilled service," unless otherwise provided.[7]

Collectively, the various provisions of the Act combine to refute the perception that a person employed by the State is virtually guaranteed continued employment, without regard to the quality of performance. Instead, the legislative scheme provides for a system in which a skilled employee's continued employment depends upon satisfactory job performance. That view is reflected in S.P.P. § 2–301(a), which states: "In keeping with State efforts to reinvent government, restructuring of the State's personnel system should enhance the delivery of services to citizens in an effective and timely manner."

As we noted, appellant was in the management service, not the skilled service. S.P.P. § 6–403(a) states:

Except as otherwise provided by law, a position ... is in the management service if the position:

(1) primarily involves direct responsibility for the oversight and management of personnel and financial resources;

(2) requires the exercise of discretion and independent judgment; and

(3) is not in the executive service.

S.P.P. § 6–402(a) provides:

Except as otherwise provided by law, a position in the Executive Branch of State government is in the professional service if the position:

---

**7.** Under the earlier State Merit System, employees in the skilled and professional services were known as "classified" employees, while those with expert training and qualifications were usually considered "unclassified" employees. *See Billhimer,* 314 Md. at 49, 548 A.2d 819; *see also* the predecessor statute, found at Maryland Code (1995 Repl. Vol.), Article 64A, §§ 1, 3.

(1) requires knowledge of an advanced type in a field of science or learning customarily acquired by a course of specialized intellectual instruction and study; and

(2) normally requires a professional license, advanced degree, or both.

Subtitle 5 of Title 7 of S.P.P. concerns employee performance appraisals. Pursuant to S.P.P. §§ 7–501 to 7–504, the Act provides that skilled, professional, and management service employees are evaluated in accordance with the subtitle. *See* S.P.P. § 7–502(a). These employees are assessed, in writing, in six month intervals, based on the employee's entry-on-duty date. The employee receives both a mid-year and end-of-year appraisal, with an overall performance rating of either "outstanding," "exceeds standards," "meets standards," "needs improvement," or "unsatisfactory." S.P.P. § 7–502(a)(b). Although S.P.P. § 7–503 sets forth a careful process of appraisal, it does not outline the consequences, if any, of a poor evaluation.

Title 11 is called "Disciplinary Actions, Layoffs, and Employment Terminations in State Personnel Management System." Subtitle 1 concerns "Disciplinary Actions," and is expressly applicable to *all* employees in the State Personnel Management System of the Executive Branch, with the exception of temporary workers. S.P.P. § 11–102. Under S.P.P. § 11–103(a), the appointing authority "has the burden of proof by a preponderance of the evidence in any proceeding under this subtitle," including appeals. As we noted, S.P.P. § 11–104(7)(ii) allows for the termination of an employee, "with prejudice," if the employee's actions are found "egregious."

Pursuant to S.P.P. § 11–111, the Secretary, "by regulation," must establish policies and procedures with regard to "disciplinary actions related to employee performance," including: (1) counseling of an employee with performance deficiencies; (2) an opportunity for the employee to improve the deficiencies; (3) imposition of disciplinary actions, if warranted; and (4) notice to the employee of disciplinary action and appeal rights. Apart from layoffs, employees in the skilled and

professional services, previously known as classified employees, may be removed from State service only for "cause." *See* S.P.P. § 11–109; COMAR 17.04.05.04.

Under S.P.P. §§ 11–109 and 11–110, skilled and professional service employees are entitled to an administrative hearing with respect to disciplinary actions. In contrast, employees in the management service, who are sometimes referred to as "at will" employees, *see* S.P.P. § 11–305, do not have a statutory right to a full administrative hearing regarding disciplinary action. *See* S.P.P. § 11–113; COMAR 17.04.05.05C. Rather, an appeal of an at-will employee's termination "may only be based on the grounds that the disciplinary action is illegal or unconstitutional." S.P.P. § 11–113(b)(2)(ii) (1997); COMAR 17.04.05.05C. A management service employee's appeal is heard by the head of the principal unit.

S.P.P. § 11–105 specifies the conduct that constitutes cause for "automatic termination of employment." Section § 11–106, which we discuss, *infra*, concerns the procedure that must be followed before any disciplinary action is taken.

Because appellant was in the management service, he was an at-will employee. Therefore, subject to certain statutory protections regarding disciplinary actions, applicable to almost all employees in the SPMS, appellant could be terminated, without cause, so long as the action was not illegal or unconstitutional.

Subtitle 3 of Title 11 is called "Employment Separations and Terminations." None of the six sections in Subtitle 3 provides that Subtitle 1 is inapplicable to an employee in the management service. Moreover, S.P.P. § 11–301 states that Subtitle 3 applies to all nontemporary employees in SPMS. S.P.P. § 11–305 is relevant. It provides:

**11–305. Termination of other employees.**

(a) *Applicability of section.*—This section only applies to an employee who is in a position:

    (1) under a special appointment; or

    (2) in the management service; or

(3) in the executive service.

(b) *Employee at will.*—Each employee subject to this section:

(1) serves at the pleasure of the employee's appointing authority; and

(2) may be terminated from employment for any reason, solely in the discretion of the appointing authority.

As appellant was in the management service, his appeal was governed by S.P.P. § 11–113. It provides, in pertinent part:

**11–113. Appeal to head of principal unit.**

(a) *Applicability of section.*—This section only applies to an employee:

(1) in the management service;

(2) in the executive service;

\* \* \*

(b) *Procedure.*—(1) An employee or an employee's representative may file a written appeal of a disciplinary action with the head of the principal unit.

(2) An appeal:

(i) must be filed within 15 days after the employee receives notice of the disciplinary action; and

(ii) may only be based on the grounds that the disciplinary action is illegal or unconstitutional.

(3) The employee has the burden of proof in an appeal under this section.

(c) *Conference.*—The head of the principal unit may confer with the employee before making a decision.

(d) *Disposition.*—(1) The head of the principal unit may:

(i) uphold the disciplinary action; or

(ii) rescind or modify the disciplinary action and restore to the employee any lost time, compensation, status, benefits.

(2) Within 15 days after receiving an appeal, the head of the principal unit shall issue the employee a written decision.

(3) The decision of the head of the principal unit is the final administrative decision.

## II.

As a threshold matter, we shall address the Employer's claim that this "appeal must be dismissed for failure to exhaust administrative remedies." Specifically, the Department asserts that appellant did not present at the administrative level any of the arguments he advanced to the circuit court or to this Court. DLLR cites *Maryland State Retirement & Pension Sys. v. Martin*, 75 Md.App. 240, 248, 540 A.2d 1188 (1988), and *Chertkof v. Dep't of Natural Resources*, 43 Md.App. 10, 16, 402 A.2d 1315 (1979), to support its position that Danaher cannot present an "entirely new theory" that "was not exposed" at the agency level. DLLR's reliance on these cases is misplaced.

First, both cases involved administrative hearings, in which the parties would have had an opportunity to present or challenge the evidence and articulate legal theories. No hearing ever occurred here. Second, in both cases the appellants raised new theories before this Court. In contrast, appellant's contentions were fully raised with the circuit court.

Moreover, it appears to us that the Department has confused principles of waiver with those of exhaustion of administrative remedies. It is a longstanding principle of administrative law that one must ordinarily exhaust statutorily prescribed administrative remedies before resorting to the courts. *See Moose v. Fraternal Order of Police*, 369 Md. 476, 486, 800 A.2d 790 (2002); *Montgomery County v. Broadcast Equities, Inc.*, 360 Md. 438, 452, 758 A.2d 995 (2000); *Young v. Anne Arundel County*, 146 Md.App. 526, 566, 807 A.2d 651 (2002); *Maryland Comm'n on Human Relations v. Downey*, 110 Md.App. 493, 526, 678 A.2d 55 (1996). Therefore, a litigant must first pursue the applicable administrative pro-

cess; other remedies cannot be pursued prematurely. *Schneider v. Pullen,* 198 Md. 64, 68, 81 A.2d 226 (1951); *Landover Books, Inc. v. Prince George's County,* 81 Md.App. 54, 62, 566 A.2d 792 (1989).

In this case, appellant clearly pursued his administrative remedies, limited though they were. He also exercised his right to seek judicial review of the Secretary's adverse decision. *See* Maryland Code (1984, 1999 Repl.Vol.), § 10–222(a)(1) of the State Government Article ("S.G.").

In *McKart v. United States,* 395 U.S. 185, 195, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), the Supreme Court noted that one purpose of the exhaustion doctrine is to prevent the possibility "that frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures." We explained in *Boyd v. Supervisor of Assessments of Baltimore City,* 57 Md.App. 603, 471 A.2d 749 (1984):

> The purposes of the doctrine of exhaustion of administrative remedies are threefold. It is designed to encourage the determination of particular issues by agencies with special expertise as to those issues; to avoid the judicial resolution of matters the legislature thought could be best performed by an agency; and to keep from the courts matters they might never be called upon to decide if the prescribed administrative remedy was followed.

*Id.* at 606, 471 A.2d 749 (quotations omitted). *See also McGee v. United States,* 402 U.S. 479, 489–91, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971) (in criminal prosecution for draft evasion, exhaustion doctrine applied to prevent defendant from raising the defense that he was a conscientious objector, because he had not pursued that contention before the Selective Service Board); *Gingell v. Bd. of County Comm'rs for Prince George's County,* 249 Md. 374, 376–77, 239 A.2d 903 (1968) (specifying the reasons for the exhaustion doctrine).

▮▮▮ Judicial review of an administrative order is generally available only when that order is "final," meaning that there must be nothing further for the agency to do. *See Holiday*

*Spas v. Montgomery County Human Relations Comm'n,* 315 Md. 390, 395, 554 A.2d 1197 (1989); *Celanese Corp. of America v. Bartlett,* 200 Md. 397, 409, 90 A.2d 208 (1952); *Crofton Partners v. Anne Arundel County,* 99 Md.App. 233, 243, 636 A.2d 487, *cert. denied,* 335 Md. 81, 642 A.2d 192 (1994). The "exhaustion" and "finality" requirements both share the common goal of preventing potentially unnecessary and premature disruption of the courts.

Appellant was an employee in the management service. He pursued all administrative avenues before turning to the courts for relief. First, through the Maryland Classified Employees Association, appellant sent a letter to the Secretary. The letter stated, in pertinent part:

> The Maryland Classified Employees Association is requesting a Second Step Hearing on behalf of John R. Danaher, ... employed by DLLR.

> We would appreciate your cooperation in scheduling a time, date and place for this hearing and notifying my office of same.

Then, as we noted earlier, appellant submitted the State Personnel Management System Appeal and Grievance Form, seeking a hearing on appeal. Thus, there is no merit to appellee's claim that appellant failed to exhaust administrative remedies.

To the extent that appellee contends that appellant's complaints are not preserved because they were waived, due to the inadequacy of his assertions below, we reject that position as well. Appellant's challenge was, of necessity, very general. DLLR did not reveal what information had been furnished so as to enable appellant to particularize his allegations. Indeed, there is no indication that appellant knew who had complained, when he learned for the first time of such complaints, or even if he had been told of the nature of the complaints. Nor was appellant copied on Crumble's memo to Crowley on May 18, 1998, although five other persons were copied. Indeed, the only indication of notice to appellant as to the particular complaints appears in Crumble's affidavit of

April 5, 2000, submitted to the circuit court well *after* appellant's termination.

Further, appellee overlooks that appellant was terminated about an hour after he was advised of the complaints, and never had an administrative hearing at which he could have particularized with specificity his contentions. Indeed, DLLR did not complain about appellant's failure to particularize his allegations until the circuit court proceeding was held.

As appellant clearly followed every procedural step required in the administrative review process, he exhausted his administrative remedies. Therefore, appellee's contention is without merit.

### III.

As a result of a reorganization in late 1997 or early 1998, appellant was reassigned to the Accounting Unit, where he functioned as a Fiscal Administrator V. Appellant's new duties did not require him to provide oversight or management, nor did he exercise discretion or independent judgment in regard to his responsibilities. Therefore, although appellant acknowledges that, at the time of his termination, he was in the management service, he maintains that his change in job duties should have altered his service category from "management" to the "skilled" service or "professional" service, consistent with S.P.P. §§ 6–401 and 6–402. According to appellant, if DLLR had reclassified him as a skilled service employee after restructuring his job position, he would have been entitled to a full administrative hearing. As a result of his erroneous classification, appellant maintains that he was improperly deprived of the appropriate administrative review in regard to his termination.

Danaher's claim is without merit. There is no dispute that, at the relevant time, Danaher was in the management service. Therefore, he was an at-will employee. Had appellant believed that the prior change in his duties and responsibilities warranted a change in his classification, his recourse was the

State's grievance procedure. Appellant cannot shift the blame to the Department because he failed to exercise his rights.

The State Personnel and Pensions Article provides that an employee may grieve the assignment of duties and responsibilities if the assigned duties and responsibilities are applicable to a different class. *See* S.P.P. §§ 7–102(e)(2), 12–102; *see also* COMAR 17.04.06.05 ("If a grievance is based on a position's reclassification ..."); COMAR 17.04.02.01B ("A grievance involving a position reclassification is governed by State Personnel and Pensions Article, §§ 7–102(e), 12–101(b)(2), and 12–205....."). Under the State's grievance procedure, however, Danaher was required to file a grievance challenging his improper classification within twenty days of gaining knowledge of the events giving rise to the grievance. *See* S.P.P. § 12–203(b).

Clearly, Danaher failed to timely file a grievance relating to his classification. Moreover, appellant filed his appeal directly with the Secretary, rather than with OAH, because of his status as a management service employee. Yet, he never complained at that time about his alleged improper category of service. Therefore, this contention is waived.

## IV.

Appellant launches numerous procedural challenges to his termination from State employment. Primarily, he contends that DLLR violated his due process rights and his statutory "fundamental employment rights" by failing, *inter alia,* to adhere to the procedural requirements of S.P.P. § 11–106.[8] He maintains that the State was obligated to "ensure

---

8. We note that appellant has cited only three cases in his brief, none of which concerns substantive or procedural due process generally, or due process in the employment context, in the public employment arena, or in an administrative proceeding. *See, e.g., Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Regan v. State Bd. of Chiropractic Exam'rs,* 355 Md. 397, 408, 735 A.2d 991 (1999); *Office of People's Counsel v. Maryland Pub. Serv. Comm'n.,* 355 Md. 1, 25–27, 733 A.2d 996 (1999) (discussing substantive due process); *Roberts v. Total Health Care, Inc.,* 349 Md. 499, 508–09, 709 A.2d 142 (1998) (discussing

that the appointing authority has all relevant information ... prior to making a decision to terminate or otherwise discipline an employee." In this regard, Danaher contends that the "thin record" demonstrates that DLLR's investigation was woefully deficient. According to appellant, the appointing authority also failed to satisfy its statutory obligation to meet with Danaher and consider mitigating circumstances. Instead, Danaher claims that the Employer relied on unsubstantiated, "bald hearsay statements" in reaching its decision to terminate him.

Appellant also complains that, substantively, the accusations did not warrant termination. He asserts that, at most, his conduct was in "bad taste." As to his termination with prejudice, appellant asserts that the "Record does not reveal that the appointing authority, Secretary Conti, ever made a determination that Danaher's alleged actions were so egregious that he does not merit employment in any capacity with the State." In sum, appellant asserts that DLLR merely "gathered three questionable memoranda which have no corroboration and made a knee-jerk decision to [t]erminate this long term and dedicated employee."

With respect to appellant's due process claim, it is well settled that a court " 'will not decide a constitutional issue when a case can properly be disposed of on a non-constitutional ground.' " *McCarter v. State*, 363 Md. 705, 712, 770 A.2d 195 (2001) (quoting *Baltimore Sun v. Mayor and City Council of Baltimore*, 359 Md. 653, 659, 755 A.2d 1130 (2000) (other citations omitted)); *Williams v. State*, 140 Md.App. 463, 473, 780 A.2d 1210, *cert. denied*, 367 Md. 90, 785 A.2d 1293 (2001). Moreover, this principle governs "even if the [dispositive] non-constitutional ground was not raised by any party in the case." *McCarter*, 363 Md. at 713, 770 A.2d 195; *see also Professional Staff Nurses Ass'n. v. Dimensions Health Corp.*, 346 Md. 132, 138–39, 695 A.2d 158 (1997). Because we resolve this case on

---

procedural due process); *Knapp v. Smethurst*, 139 Md.App. 676, 703–706, 779 A.2d 970 (2001); *Samuels v. Tschechtelin*, 135 Md.App. 483, 525–538, 763 A.2d 209 (2000).

the basis of the applicable statute, we decline to address appellant's constitutional due process claim. We explain further.

▆ Appellant maintains that, even as an at-will employee in the management service, S.P.P. § 11–106 applies to him. We agree.

As we observed, Subtitle 1 of Title 11 concerns disciplinary matters. Under S.P.P. § 11–102, Subtitle 1 expressly applies to *all* employees in the SPMS, except temporary employees. Therefore, although appellant was an at-will employee, he was entitled to the protections afforded by S.P.P. with regard to termination based on alleged misconduct. In this regard, S.P.P. § 11–106 is relevant. It provides, in part:

§ **11–106. Duty of appointing authority prior to imposing sanctions.**

(a) *Procedure.*—**Before** taking any disciplinary action related to employee misconduct, an appointing authority **shall:**

(1) investigate the alleged misconduct;

(2) meet with the employee;

(3) consider any mitigating circumstances;

(4) determine the appropriate disciplinary action, if any, to be imposed; and

(5) give the employee a written notice of the disciplinary action to be taken and the employee's appeal rights.

(Emphasis added). Under S.P.P. § 1–101(b), the "appointing authority" refers to "an individual or a unit of government that has the power to make appointments and terminate employment."

▆ Section 11–106(a) "prescribes what must be done before imposing discipline...." *Geiger*, 371 Md. at 143, 807 A.2d 32. As noted, S.P.P. § 11–106(a) provides that, "before" any disciplinary action is taken, the appointing authority "shall" follow certain procedural steps. When the word "shall" appears in a statute, it generally has a mandatory meaning. *See In re Abiagail C.*, 138 Md.App. 570, 581, 772 A.2d 1277 (2001). As this Court recently observed, "[t]he

purpose of the requirement [in S.P.P. § 11–106] that an employee's misconduct be investigated by an appointing authority is to avoid the imposition of discipline based on unsubstantiated accusations." *Maryland Reception, Diagnostic & Classification Ctr. v. Watson,* 144 Md.App. 684, 693, 800 A.2d 16, *cert. denied,* 371 Md. 71, 806 A.2d 681 (2002); *see Geiger,* 371 Md. at 144, 807 A.2d 32 ("It is significant that one of the prerequisites for the imposition of discipline is the conduct of an investigation of the alleged misconduct.").

COMAR 17.04.04.04 is also relevant. It states, in part:

**Separation Reports for Unsatisfactory Performance or Conduct.**

A. A unit shall report in writing to the Secretary when an employee is voluntarily or involuntarily separated from a position with an unsatisfactory employment record. The unit shall give the employee a copy of the report, either in person or by certified mail sent to the employee's last address of record. The Secretary shall determine the form of the report. The unit shall forward the report to the Secretary within 30 days of the employee's separation.

B. Separation for unsatisfactory performance or conduct is grounds for denial of future State employment for a period of up to 3 years. Termination with prejudice is a bar to employment in any capacity with the State for 3 years.

We turn to consider the scanty record in light of the applicable statutory and regulatory provisions of S.P.P. § 11–106. Among other things, under S.P.P. § 11–106(a)(1), the appointing authority was required to make an investigation of appellant's alleged misconduct. The record reveals that Crumble, the Director of the Office of Personnel and Training, wrote a memorandum on May 18, 1998, to the Chief Financial Officer, recommending Danaher's termination. But, Crumble's two paragraph memorandum does not detail any investigation of Danaher's alleged misconduct. To be sure, Crumble attached the memorandum of Ms. Carroll, along with written "testimony" of Ms. Ellen. There is no indication in the record, however, of an attempt by the Employer to verify or corrobo-

rate the allegations of Ms. Ellen or Ms. Carroll. For example, Crumble did not suggest in his Memorandum that anyone at DLLR spoke with Ms. Ellen or Ms. Carroll regarding Danaher's conduct, or with persons mentioned in their memoranda who were either present or within earshot of appellant at the relevant times.

Similarly, the undated and unsigned memorandum from Ms. Newsome to Sharon Ball reveals that Sheena Thomas, a DLLR employee, was present during the conversation that prompted Ms. Newsome's memorandum. Although Ms. Thomas was clearly a witness to the exchange, the record does not reflect that anyone at DLLR interviewed Ms. Thomas about appellant's remarks, in an effort to determine, among other things, whether she perceived appellant's comments as "racially motivated." Moreover, although Ms. Yeates may have been present, she was not questioned about what occurred.

Of particular significance, we have found no evidence in the record that anyone involved in the matter on behalf of the Employer ever spoke with Ms. Meads, the only individual who was the subject of alleged improper and offensive touching by appellant. For reasons that are not clear, Crumble did not consider it "necessary" to speak with Ms. Meads. Moreover, without explanation, Crumble claimed that he was concerned about Ms. Meads's "veracity." Considering that Ms. Meads flatly repudiated the allegation of Danaher's misconduct in a recorded statement that she provided in June 1998, it is difficult to overlook DLLR's failure to interview her. Crumble also determined that he did not need to speak with the three complainants; he regarded their statements as "credible," based on their willingness to put their statements in writing. Crumble never indicated, however, that Ms. Meads refused to submit a written statement. Indeed, there is no evidence that the Employer ever asked her to do so. Given Ms. Meads's willingness to file a grievance to dispute the accusations, it seems quite likely that she would have provided a written statement if one had been requested.

We recognize that S.P.P. § 11–106(a)(1) does not detail how the Employer was to conduct the required investigation. When we construe the words of a statute, we may refer to the dictionary. *See Rouse–Fairwood Ltd. P'ship v. Supervisor of Assessments,* 120 Md.App. 667, 689, 708 A.2d 19 (1998), *cert denied,* 365 Md. 475, 781 A.2d 780 (2001). The word "Investigate" is defined as: "To inquire into (a matter) systematically[.]" BLACKS LAW DICTIONARY 830 (7th ed.1999). The word "investigation," is defined as a "careful search; systematic inquiry." WEBSTER'S NEW WORLD DICTIONARY 320 (Pocket Ed.1987).

In our view, the Employer did not conduct a "careful search" or a "systematic inquiry." Instead, the Employer seems to have made a slip shod effort to determine what occurred on the dates in question, by accepting as true the contents of the written memoranda submitted by the three DLLR employees. At the very least, before terminating a twenty-five year veteran of State service, the Employer's investigation should have included efforts to interview those persons who were witnesses to appellant's allegedly offensive behavior. And, DLLR certainly should have questioned Ms. Meads, as she was the only person who was allegedly touched by appellant.

In performing an adjudicatory function, an administrative agency must adhere to basic principles of fairness. *See Coleman v. Anne Arundel Police Dep't,* 369 Md. 108, 142, 797 A.2d 770 (2002); *Gigeous v. E. Corr. Inst.,* 363 Md. 481, 509, 769 A.2d 912 (2001). In our view, when an investigation is statutorily mandated prior to the imposition of sanctions, it is unfair to discipline an employee without an adequate investigation of the alleged wrongdoing. Appellant was fired based on employee statements that the Employer deemed credible, without verification.

In addition, S.P.P. § 11–106(a)(2) obligates the appointing authority to "meet" with the employee. There is no evidence, however, that any meeting occurred at which appellant was provided with a meaningful opportunity to respond to

the accusations, or to present DLLR with information that might help DLLR assess the veracity of the allegations. In our view, a meeting between appellant and Crumble one hour before appellant was terminated does not satisfy the letter or spirit of S.P.P. § 11–106(a)(2).

Clearly, by the point in time when Crumble met with appellant, the Department had already determined to discharge appellant; it was not interested in ascertaining his version of events. If the agency had conducted a meaningful meeting with appellant, it would have done so in time to consider his explanation, if any, and to explore or verify his comments. As best we can determine, that never happened.

Further, under S.P.P. § 11–106(a)(3), DLLR was required to consider mitigating circumstances "before taking any disciplinary action related to employee misconduct." *Watson,* 144 Md.App. at 694, 800 A.2d 16. *See also* COMAR 17.04.05.04D(4). In *Watson,* the Court suggested that an employee's "extensive career of meritorious State service" may constitute mitigation. *Id.* at 695, 800 A.2d 16. Yet, the record does not reveal what, if any, mitigating circumstances were considered by the appointing authority. For example, there is no indication that the Secretary reviewed or considered Danaher's lengthy career with the State, the numerous awards and citations supposedly in his personnel file, or even his most recent evaluations. Nor are we aware that Danaher had an opportunity to bring his record to the Employer's attention at a meeting prior to his discharge.

With respect to mitigating circumstances, *Maryland State Retirement Agency v. Delambo,* 109 Md.App. 683, 675 A.2d 1018 (1996), provides guidance. Delambo, a State employee for over twenty years, used her computer to "access" the subdirectory of the agency's Executive Director. *Id.* at 686–87, 675 A.2d 1018. One of the files she accessed contained a copy of the letter of appointment that had been issued to the new Executive Director, whose identity had not yet been publicly released. After appellee revealed the Executive Director's identity to two co-workers, the agency sought her

removal from State service, and she was suspended without pay. Following a hearing before an Administrative Law Judge, the charges were upheld; the agency concluded that " 'a reasonable person in [appellee's] position would have known that her actions constituted misconduct, even in the absence of an Agency directive . . . [so appellee's] exceedingly poor judgment, resulting in her misconduct reflects that she is unfit to hold a position in this agency.' " *Delambo,* 109 Md. App. at 687, 675 A.2d 1018. The Secretary adopted the ALJ's recommendations.

The circuit court upheld the Secretary, but modified the punishment by reducing it to a suspension without pay. This Court said, at 109 Md.App. at 688–90, 675 A.2d 1018:

Appellant is entitled to impose a number of disciplinary sanctions, including (1) official reprimand, (2) demotion pursuant to § 4–604, (3) suspension without pay pursuant to § 9–402, and (4) removal pursuant to § 9–201 et. seq. *See also* COMAR 06.01.01.45. Demotion, suspension, and removal of classified employees may only occur for cause. The rationale behind each sanction is quite different. Demotion must be supported by a written recommendation that includes the specific reasons for the demotion. COMAR 06.01.01.41. Suspension may occur only for misconduct, negligence, inefficiency, insubordination, or other reason satisfactory to the Secretary of Personnel. COMAR 06.01.01.46. Cause for removal, however, requires at least one of the following serious elements:

(1) incompetence or inefficiency;

(2) wanton carelessness or negligence in performing duties;

\* \* \*

Thus, the conduct constituting cause for removal is both specific and extreme in character. Proceedings for demotion or suspension differ from proceedings in which the agency seeks termination. When the agency contends that the charges are serious enough to warrant removal, once

the factual bases for those charges have been established, the ALJ must then recommend that the Secretary

(a) restore the employee, or

(b) suspend the employee without pay, or

(c) demote the employee, or

(d) remove the employee from the position and from the classified service, or

(e) take other appropriate action

COMAR 06.01.01.61. A written decision must be submitted regardless of what sanction is imposed.

(Internal citations omitted).

Although the Court affirmed the agency's classification of Delambo's actions as "ordinary misconduct," the Court could not affirm the sanction, because the agency failed to articulate adequately why appellee's removal from service was appropriate. *Delambo*, 109 Md.App. at 690–691, 675 A.2d 1018. Writing for the Court, Chief Judge Murphy reasoned, at 109 Md.App. at 691, 675 A.2d 1018:

There is no indication that either the ALJ or the Secretary (1) considered any of the other relevant factors that must be considered in determining the severity of appellee's punishment, or (2) considered imposing any alternative sanctions that might have been appropriate under the circumstances....

For all that appears in the record before us, appellee was fired because she could be fired. We cannot determine what—if any—consideration was given to appellee's (1) overall employment history in State service, (2) attendance record during that period of time, (3) disciplinary record at the present agency and at other State agencies as well, (4) work habits, and (5) relations with fellow employees and supervisors. All these factors should have been considered by the ALJ and the Secretary. Appropriate consideration should also have been given to making "the punishment fit the crime." In this regard, appellant was fired for violating a **subsequently** enacted regulation that now expressly prohibits the conduct at issue, and appellee's "misconduct" was

made possible by the absence of safeguards that would have easily prevented her from accessing the "sensitive" information. Neither the ALJ nor the Secretary has given consideration to either of these facts in a way that permits judicial review. As neither this court nor the circuit court can substitute its judgment for that of the agency, a remand to the agency is necessary.

(Boldface in original).

The *Delambo* Court concluded that "the agency's 'bottom line' sanction [should] be accompanied by a statement that explains (1) precisely what (written or unwritten) law, procedure, rule or regulation has been violated by the employee; and (2) why the agency has decided against imposing any of the other sanctions that it has discretion to impose. . . ." *Id.* at 692, 675 A.2d 1018. As we see it, the same rationale applies here.

Notwithstanding DLLR's discretion as to punishment, *Delambo,* 109 Md.App. at 690, 675 A.2d 1018, there is nothing in the record here to demonstrate that the Secretary considered why Danaher's removal was an appropriate exercise of discretion. Nor is there any indication that DLLR satisfied the requirements of S.P.P. § 11–106. As we mentioned, S.P.P. § 11–106 applies to all SPMS employees, except temporary employees. Therefore, this Court's reasoning in *Delambo* is applicable; DLLR was required to satisfy *all* the requirements of S.P.P. § 11–106. Appellant did not have the benefit of the protections afforded him by law, however. In its role as an employer, the State has obligations under S.P.P. § 11–106, to conduct itself in such a way so as to ensure that the appointing authority has all relevant information before making a decision to terminate or otherwise discipline an employee. Danaher, like all non-temporary employees in the State Personnel Management System, was entitled to these protections.

Appellants do not rely on the so called *Accardi* doctrine to support their position. Nevertheless, we believe that doctrine is relevant to the disposition of this case.

The *Accardi* doctrine derives its name from the case of *Accardi v. Shaughnessy,* 347 U.S. 260, 267–68, 74 S.Ct. 499, 98 L.Ed. 681 (1954). It is a rule of federal administrative law, which generally provides that a federal administrative agency must follow its own rules and regulations. *Id.* at 267–68, 74 S.Ct. 499; *see United States v. Caceres,* 440 U.S. 741, 751, n. 14, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.") As the Court of Appeals recently recognized in *Maryland Transp. Auth. v. King,* 369 Md. 274, 286, 799 A.2d 1246 (2002), "a similar doctrine is reflected in Maryland administrative law." *See also Jordan Towing, Inc. v. Hebbville Auto Repair, Inc.,* 369 Md. 439, 457, 800 A.2d 768 (2002) (" 'Moreover, numerous opinions of this Court have involved the review of agency action to determine if the agency complied with its regulations and required procedures.' " (citation omitted)).

This Court has recognized or applied the *Accardi* doctrine in numerous cases involving Maryland administrative law matters. *See, e.g., Anastasi v. Montgomery County,* 123 Md.App. 472, 491, 719 A.2d 980 (1998). In *Anastasi,* 123 Md.App. at 491, 719 A.2d 980, we said:

Thus, to the extent that Administrative Procedures apply to a particular county agency or department, and to the extent that they have the force and effect of law, and are not simply interpretive rules, policy statements, or other, lesser, rules of agency organization, procedure or practice, that agency or department, under the well-known *Accardi* doctrine, must follow them; and if the agency or department fails to follow such Administrative Procedures when taking an action, then the agency's action is invalid.

Recently, in *Smith v. State,* 140 Md.App. 445, 780 A.2d 1199 (2001), we reiterated that " '[a]n agency of the government must scrupulously observe rules, regulations or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down.' " *Id.* at 455, 780 A.2d 1199 (quoting *Hopkins v. Maryland Inmate Grievance*

*Comm'n,* 40 Md.App. 329, 335–36, 391 A.2d 1213 (1978)). Until recently, however, the Court of Appeals had not expressly adopted the *Accardi* doctrine with respect to matters of Maryland administrative law, even though the Court had reviewed agency conduct to determine compliance with agency regulations. *See, e.g., Board of Physician Quality Assurance v. Levitsky,* 353 Md. 188, 725 A.2d 1027 (1999). The decisions in *Jordan Towing,* 369 Md. at 455–57, 800 A.2d 768, and *King,* 369 Md. at 282, 284–86, 799 A.2d 1246, reveal that the Court of Appeals now recognizes the *Accardi* doctrine in Maryland.

As a matter of legal doctrine, regulations promulgated by an agency "cannot be waived, suspended or disregarded in a particular case as long as such rules and regulations remain in force." *Smith,* 140 Md.App. at 455, 780 A.2d 1199; *see Jordan Towing,* 369 Md. at 455, 800 A.2d 768; *King,* 369 Md. at 282, 799 A.2d 1246. Rather, "an administrative agency should follow its own established rules, regulations and procedures." *Jordan Towing,* 369 Md. at 455, 800 A.2d 768; *see King,* 369 Md. at 285, 799 A.2d 1246; *see also* Md.Code (1984, 1999 Repl.Vol.), § 10–222(h)(iii), (iv) of the State Government Article. As the Court said in *King,* 369 Md. at 286, 799 A.2d 1246:

> [T]he judicial review section of the Maryland Administrative Procedure Act provides that a reviewing court may 'reverse or modify the [administrative] decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision ... (iii) results from an unlawful procedure [or] (iv) is affected by any other error of law....' Code (1984, 1999 Repl.Vol.), §§ 10–222(h)(iii) and (iv) of the State Government Article.

*Accord Jordan Towing,* 369 Md. at 457, 800 A.2d 768.

"In determining whether an agency rule has sufficient force and effect to trigger an application of the *Accardi* doctrine, Maryland courts generally look to see whether it 'affects individual rights and obligations,' or whether it confers 'important procedural benefits upon individuals.'" *Anastasi,* 123 Md.App. at 491, 719 A.2d 980 (internal citations omitted).

We conclude that S.P.P. § 11–106 confers important procedural benefits that were not satisfied in this case.

As we stated, there is nothing in the record to suggest that DLLR fully satisfied the requirements of S.P.P. § 11–106. DLLR had a duty to comply with the statute by conducting an investigation and considering mitigating circumstances. Accordingly, we shall vacate the judgment and remand the case so that the Department can conduct a proper investigation and consider mitigating circumstances, including, but not limited to appellant's overall employment history in State service, attendance, work habits, and relationships with other employees and supervisors.

## V.

Appellant argues that DLLR erred in terminating him "with prejudice." Specifically, he argues that nothing in the record suggests that his alleged actions were so egregious as to merit termination with prejudice, given the length of his State service. For the guidance of the parties on remand, we shall briefly address this issue.

A termination with prejudice would bar Danaher from employment with the State in any capacity for three years. COMAR 17.04.04.04.[9] Under S.P.P. § 11–104, the Secretary has a range of possible disciplinary actions. The statute provides:

### § 11–104. Disciplinary actions permitted.

An appointing authority may take the following disciplinary actions against any employee:

---

9.  COMAR 17.04.04.04 governs separations, reemployment, and reinstatement of State Personnel. It states, in pertinent part:

.04  **Separation Reports for Unsatisfactory Performance or Conduct.**
B.  Separation for unsatisfactory performance or conduct is grounds for denial of future State employment for a period of up to 3 years. Termination with prejudice is a bar to employment in any capacity with the State for 3 years.

\* \* \*

(7) with prior approval of the head of the principal unit:

(i) terminate the employee's employment, without prejudice; or

(ii) if the appointing authority finds that the employee's actions are egregious to the extent that the employee does not merit employment in any capacity with the State, terminate the employee's employment with prejudice.

Appellant argues that his alleged actions were not so egregious as to merit termination with prejudice, because they did not fall under those actions listed in S.P.P. § 11–105, mandating automatic termination. That provision states, in pertinent part:

### § 11–105. Automatic termination of employment.

The following actions are causes for automatic termination of employment:

(1) intentional conduct, without justification, that:

(i) seriously injures another person;

(ii) causes substantial damage to property; or

(iii) seriously threatens the safety of the workplace;

(2) theft of State Property of a value greater than $300;

(3) illegal sale, use, or possession of drugs on the job;

(4) conviction of a controlled dangerous substance offense by an employee in a designated sensitive classification;

(5) conviction of a felony;

(6) accepting for personal use any fee, gift, . . . in connection with . . . State employment if given to the employee by any person with the hope . . . of receiving a favor . . . .;

Appellee counters that "[t]he fact that the basis for M[r]. Danaher's termination—'unjustifiably offensive conduct in the workplace'—is not listed as one of the eight grounds for termination set forth in [S.P.P.] has no relevance."

Under the statute, even if an employee commits an act that warrants automatic termination, the termination need not be with prejudice. Assuming that appellant was

otherwise lawfully terminated, DLLR had the discretion to terminate him with prejudice, so long as the Secretary was satisfied that the misconduct was so egregious as to warrant a termination with prejudice. On the record before us, however, it is not clear that the Secretary ever made such a determination. Because such a termination is an extreme disciplinary measure, and is not mandatory even when there is cause for automatic termination under S.P.P. § 11–105, the record should reflect that the Secretary fully considered the propriety of that sanction before terminating an employee with prejudice. The record here does not demonstrate that the extreme sanction was imposed after careful consideration of the relevant circumstances and factors.

**JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY WITH INSTRUCTIONS TO REMAND TO DLLR FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY DLLR.**